# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-KA-00695-SCT

*MICAH RUFFIN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/12/2007 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | IMHOTEP ALKEBU-LAN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JOHN R. HENRY |
| DISTRICT ATTORNEY: | JAMES H. POWELL, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/23/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., EASLEY AND GRAVES, JJ.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Micah Ruffin was found guilty of armed robbery and capital murder in the Circuit Court of Yazoo County.  Finding no error, we affirm.

## FACTS

¶2.    On July 1, 2002, Krystal White, Cortiss Washington, Osbie Levi Jefferson, Darwin Strahan, Micah Ruffin, Thomas Giles, Tommy White, Jr., and Latoya Allen, along with her four children, were gathered at the home of Tommy White, Jr., in Yazoo County.  Around mid-morning, a game of dice commenced.  Several people, including Strahan, joined the

game intermittently. Eventually, Tommy White, Jr., and Giles were the only two remaining competitors. As they continued the game, Strahan walked outside. Moments later, he stepped back inside and called for Ruffin to join him outside. Shortly thereafter, Strahan and Ruffin burst through the door. Strahan began beating Giles with a brick. Ruffin had a gun that he used to hit Giles at least once.[1] Giles was severely beaten[2] and robbed of his shoes and his money.[3]

¶3.    At some point, Ruffin gave the gun to Strahan. Strahan then ordered everyone to the back of the home. In the meantime, Ruffin pulled the car around, popped the trunk, and went back inside. Strahan pulled Giles up by the hair, walked him outside, and told him to get into the trunk of the car. Strahan then went back inside and asked if anyone was leaving with him. Krystal White and Washington left with Strahan and Ruffin.

¶4.    Ruffin drove to a frontage road just off Highway 3, and backed the car into a cornfield. Both Ruffin and Strahan exited the car. Strahan pulled Giles out the trunk, and walked him to the edge of the cornfield. Ruffin returned to the car and asked Krystal White to hand him his "toy," i.e., the gun. Ruffin brought the gun to Strahan. Strahan then shot Giles six times in the head with the .22 caliber gun.

---

[1] Ruffin admitted to hitting Giles once with the gun. Allen testified that both Strahan and Ruffin beat Giles.

[2] Dr. Stephen Hayne, the state's chief pathologist at that time, testified that Giles suffered multiple contusions, lacerations, and abrasions over his entire body.

[3] Ruffin said that Strahan stole Giles's shoes. Krystal White testified that Ruffin took some money out of Giles's pocket during the assault. It is not clear how much money was taken. According to Ruffin, the dice game involved "a lot of twenties" and a one- hundred-dollar bill.

¶5.     They fled the scene, and Ruffin drove the party to Jackson, Mississippi. They initially stopped at the home of Krystal White's mother, but were unable to get inside. They stopped briefly at Ruffin's home, at which point Ruffin instructed Washington to wash the car. The party eventually rented a hotel room in Jackson.

¶6.     On July 1, 2002, Eric Snow, an investigator with the Yazoo City Police Department, received notice that a body had been discovered in a cornfield off Highway 3. Deputy Dan Nunn informed Snow that he had responded to a call earlier that same day at the home of Tommy White, Jr. Snow later received a call from Allen, who provided him the names of everyone who had been at the home of Tommy White, Jr., on the morning in question. Ruffin eventually was arrested in Jackson and interrogated at the Yazoo City Police Department. He gave two tape-recorded statements to the police.

¶7.     Ruffin was indicted on armed robbery and capital murder in the commission of a kidnapping. A jury trial was conducted in the Circuit Court of Yazoo County on April 2-5, 2007. Allen, Jefferson, Washington, Tommy White, Jr., and Krystal White testified at trial. Ruffin was convicted of capital murder and sentenced to life imprisonment without parole. He was also found guilty of armed robbery and sentenced to ten years, to run concurrently with the life sentence.

### DISCUSSION

**I.     The trial court erred in denying Ruffin's motion to suppress.**

¶8.     This Court will reverse the denial of a motion to suppress only if the trial court's ruling is manifest error or contrary to the overwhelming weight of the evidence. *Palm v. State*, 748 So. 2d 135, 142 (Miss. 1999) (citing *McGowan v. State*, 706 So. 2d 231, 235

3

(Miss. 1997)).  This Court will not reverse the lower court's finding that the confession was voluntary and admissible so long as the court applied the correct principles of law and the finding is factually supported by the evidence.  *Palm*, 748 So. 2d at 142 (citing *Greenlee v. State*, 725 So. 2d 816, 826 (Miss. 1998)).  Once a trial judge determines admissibility, the defendant/appellant faces a heavy burden in trying to reverse on appeal.  *Greenlee*, 725 So. 2d 816, 826 (Miss. 1998) (quoting *Hunt v. State*, 687 So. 2d 1154, 1160 (Miss. 1996)).

¶9.    A valid waiver of *Miranda*[4] rights must be made "'voluntarily, knowingly and intelligently.'"  *Chim v. State*, 972 So. 2d 601, 603 (Miss. 2008) (citing *Coverson v. State of Mississippi*, 617 So. 2d 642, 647 (Miss. 1993)).  The State's burden of proving all facts prerequisite to admissibility is met, and a prima facie case is made out "by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward."  *Cox v. State*, 586 So. 2d 761, 763 (Miss. 1991).  The defendant must rebut the State's prima facie case by offering "testimony that violence, threats of violence, or offers of reward induced the confession."  *Cox*, 586 So. 2d at 763.

¶10.    A waiver is voluntary if it is the result of "'free and deliberate choice rather than intimidation, coercion or deception.'"  *Chim*, 972 So. 2d at 603 (Miss. 2008) (citing *Coverson*, 617 So. 2d at 647).  "'[A] waiver is knowing and intelligent if it is made with a

---

    [4] "In *Miranda*, the United States Supreme Court held that the Fifth and Fourteenth Amendments' prohibitions against compelled self-incrimination require that, prior to custodial interrogation, the accused must be advised of his right to remain silent and his right to counsel."  *Chim v. State*, 972 So. 2d 601, 603 (Miss. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)).

4

full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" **Chim**, 972 So. 2d at 603 (citing **Coverson**, 617 So. 2d at 647).

¶11. On the evening of July 8, 2002, Ruffin gave two statements at the Yazoo City Police Department. These statements were tape-recorded and subsequently were transcribed. The first statement began at 8:00 p.m, with only investigator Snow and Ruffin in the room. Snow testified that he read Ruffin his **Miranda** rights before handing him the **Miranda** form to read for himself. Snow stated that Ruffin appeared to understand and signed the form, just below the statement of rights. Snow then read Ruffin the lower portion of the **Miranda** form regarding waiver of rights and handed the form to Ruffin for his review. Ruffin did not sign beneath the waiver portion of the form, but nevertheless agreed to talk. At no time did Ruffin indicate that he wished to stop talking or attempt to invoke his right to an attorney. Snow testified that he did not threaten Ruffin, and that Ruffin gave his statement freely and voluntarily. The first statement concluded at 8:28 p.m.

¶12. Following the first statement, and before either person left the room, Ruffin volunteered to give another statement. The second statement commenced at 8:36 p.m., with Detectives Thomas Ervin, Charles Taylor, and Larry Davis present.[5] Before this second statement, Snow stated, "I ADVICED [SIC] YOU OF YOUR MIRANDA RIGHTS ON THE OTHER TAPE. DO YOU KNOW WHAT YOUR RIGHTS ARE? YOU HAVE THE

---

[5] At the suppression hearing, Ruffin called Detectives Davis and Ervin to testify. Davis had not been involved in the initial reading of rights prior to Ruffin's first statement, and therefore could not say whether a **Miranda** warning was given or not. Ervin, likewise, did not know what had been said in the earlier interrogation. Detective Taylor was unable to testify due to insufficient notice of the suppression hearing.

RIGHT TO AN ATTORNEY AND YOU CAN STOP THIS INTERVIEW ANY TIME YOU LIKE.  DO YOU UNDERSTAND THAT?"  Ruffin indicated that he understood and proceeded to give the second statement.  Snow testified that no threats, coercion, or promises were made to Ruffin, and that this second statement also was made freely and voluntary.

¶13.  Ruffin testified at the suppression hearing.  He stated that he was enrolled in a special-education program and suffered from dyslexia, which made it difficult for him to read unless the words were large.  When asked whether he had any recollection of being informed of his *Miranda* rights, Ruffin responded, "I can't remember."  He said that he did not understand what was happening at the time of the interrogation because he had never been subjected to an interrogation.

¶14.  The trial court denied Ruffin's motion to suppress as follows:

> The evidence presented is that Officer Snow advised the defendant of his rights orally.  The defendant testified that he does not recall, that he does not remember whether or not he was given his rights.  Therefore, this Court has to take the statement of Officer Snow that he did orally inform him of his Miranda rights.

> Therefore, the evidence before the Court indicates that the defendant was given his Miranda rights, that he understood.  There was no indication that he did not understand his rights.  There's nothing, no testimony from the defendant or the officers that he advised him that he was dyslexic or he did not understand his rights.

> Therefore, the Court finds that [Ruffin's statements] are voluntary, freely-made . . . .

¶15.  Ruffin argues that he did not voluntarily waive his privilege against self-incrimination. For support, he points to the fact he did not sign the waiver portion of the *Miranda* form, and did not execute another *Miranda* form prior to the second interrogation.  More significantly,

6

he alleges that he was coerced to talk. He submits that Snow threatened or intimidated him with comments made both on and off the record. Additionally, Ruffin contends that his mental impairment(s) rendered him unable knowingly and intelligently to waive his rights.

¶16. Ruffin first submits that his statements should have been suppressed because he did not sign the waiver portion of the *Miranda* form or execute a second *Miranda* form. Yet, there is no requirement that a valid waiver must be in writing and signed for an incriminating statement to be admissible. *Armstead v. State*, 978 So. 2d 642, 648 (Miss. 2008) (citing *Davis v. State*, 320 So. 2d 789, 790 (Miss. 1975)). All that is required is that the accused be "afforded the protection of the Miranda warning and [] thereafter knowingly and intelligently waive[] his rights and freely and voluntarily make[] the statement." *Davis*, 320 So. 2d at 790. Therefore, Ruffin's failure to sign the waiver portion of the *Miranda* form or execute a second *Miranda* form is non-dispositive.

¶17. We find sufficient evidence to support that Ruffin was adequately advised of his *Miranda* rights. Snow testified that he read Ruffin his *Miranda* rights prior to the first interrogation. Ruffin also signed a *Miranda* form confirming that he had been advised of his rights. The second interrogation commenced just eight minutes after the first interrogation ended, and before Ruffin had exited the room. At the beginning of the second interrogation, Snow referred to his prior administration of rights and readvised Ruffin that he had the right to an attorney and could stop the interrogation at any time. Ruffin affirmed that he understood his rights. Snow's general recitation of Ruffin's rights at the beginning of the second interrogation may or may not have been sufficient to re-*Mirandize* him. *Duckworth v. Eagan*, 492 U.S. 195, 202-03, 109 S. Ct. 2875, 2880, 106 L. Ed. 2d 166, 176-77 (1989)

7

(citing *California v. Prysock*, 453 U.S. 355, 361, 101 S. Ct. 2806, 2810, 69 L. Ed. 2d 696, 702 (1981)) ("[t]he inquiry is simply whether the warnings reasonably 'convey to [a suspect] his rights as required by *Miranda*'"). But regardless of whether Ruffin was re-*Mirandized*, he had been read his rights before the first interrogation, which had ended just eight minutes earlier. Given the small passage of time between interrogations, and considering the totality of the circumstances, we find that Ruffin was adequately advised of his rights. *See Johnson v. State*, 475 So. 2d 1136, 1145 (Miss. 1985) (statement admissible where rights were given in the first interrogation, but were not fully given in a second interrogation one hour later); *cf. McCarty v. State*, 554 So. 2d 909, 913 (Miss. 1989) (defendant was not adequately warned where he was under arrest during each interrogation, was subjected to constant interrogation, had learned of his rights only after asking others around the jail, and the time between first and third interrogations was three-and-a-half to four hours).

¶18.    Having determined that Ruffin was adequately advised of his rights, we consider next whether Ruffin voluntarily, knowingly, and intelligently waived such rights. Snow testified that Ruffin was not threatened, intimidated, or offered any promises or rewards in exchange for talking. Ruffin, however, argues that his statements were coerced. As support, he points to statements made by Snow during the first interrogation, and contends that other statements were made off the record.

¶19.    Ruffin points to  the following exchange that took place during his first interrogation as evidence of coercion:

[Snow:]        WHAT HAPPENED AFTER YALL [SIC] GOT HOME?

8

[Ruffin:]    WE HAD GONE TO CRYSTAL [SIC] HOUSE. I'M TRYING TO [SIC] I REMEMBER WE WENT TO THE PARTS [SIC] WE STOPPED BY THE STORE SO THE GIRLS COULD GET THEM SOMETHING TO WEAR.

[Snow:]    SO THEY COULD GET THEM SOMETHING TO WEAR?

[Ruffin:]    YES SIR.

[Snow:]    WHAT DID THEY DO[,] BOUGHT [SIC] CLOTHES?

[Ruffin:]    YES SIR.  BRAS AND PANTIES AND SOCKS[.]

[Snow:]    WHO PAID FOR THAT?

[Ruffin:]    I DON'T KNOW.  I SAT OUT IN THE CAR.  I DIDN'T GO INTO THE STORE.

[Snow:]    IS THIS STATEMENT TRUE?

[Ruffin:]    (INAUDIBLE)

[Snow:]    IT'S NOT TRUE.  I TOLD YOU I KNEW WHAT HAPPENED.[6]  IF THAT'S ALL YOU WANT TO SAY THAT'S FINE.  BUT THAT IS NOT THE TRUTH.  I KNOW THE TRUTH.  YOU KNOW THE TRUTH.  I AM GOING TO GIVE YOU A CHANCE TO TELL ME THE WHOLE TRUTH.  WHO HAD THE GUN?

[Ruffin:]    (INAUDIBLE)

[Snow:]    WHO TOOK IT OUT OF THE CAR?

[Ruffin:]    I DO NOT KNOW.  IT WAS IN THE TRUNK.

[Snow:]    WHO TOOK IT OUT OF THE TRUNK?

[Ruffin:]    I DO NOT KNOW WHO TOOK IT OUT OF THE TRUNK. (INAUDIBLE)

---

[6] Ruffin argues that this particular remark proves that Snow told Ruffin some things before the tape began recording.  Even assuming that this is true, Ruffin offered no testimony as to what Snow or any other officer said.

[Snow:]        WHO'S [SIC] GUN WAS IT?

[Ruffin:]      I DON'T KNOW WHERE HE GOT IT FROM.

[Snow:]        WHO TOOK THE GUN OUT OUT [SIC] THERE AT THE
               CORN FIELD?

[Ruffin:]      INAUDIBLE

¶20.   This Court has distinguished between an interrogator's "mere exhortation" to tell the truth, and an inducement to confess. *Willie v. State*, 585 So. 2d 660, 668 (Miss. 1991). "[A] mere exhortation or adjuration to speak the truth will not exclude a confession . . . ." *Robinson v. State*, 247 Miss. 609, 612-13 (1963) (citing *Matthews v. State*, 102 Miss. 549, 59 So. 842 (1912)).  Whether an interrogator's statement is a mere exhortation or an inducement generally depends on the circumstances surrounding the confession, such as the defendant's youth, good reputation, lack of familiarity with the criminal justice system, and relationship with or trust in the interrogating officer(s). *Willie*, 585 So. 2d at 668 (citing *Miller v. State*, 243 So. 2d 558, 559 (Miss. 1971); *Dunn v. State*, 547 So. 2d 42, 46 (Miss. 1989)).  This Court has considered these surrounding circumstances in close cases where the interrogator implies that leniency will be granted if the defendant agrees to talk. *Willie*, 585 So. 2d at 668 (circumstances considered where sheriff told the defendant that it was best to tell truth, that he only wanted the defendant to tell the truth, and that it would be better for him to tell the truth); *Chase v. State*, 645 So. 2d 829, 839 (Miss. 1994) (circumstances considered where officer told the defendant that his co-defendant was laying everything on him, and that it would be best for the defendant and would help him if he talked to them); *Duplantis v. State*, 644 So. 2d 1235, 1243-44 (Miss. 1994) (circumstances considered where

10

officer told defendant that it would be better for him if he told the truth); ***Miller v. State***, 243 So. 2d 558, 559 (Miss. 1971) (circumstances considered where officer told the defendant that he would be better off telling the truth).

¶21.   We find that, even by the most liberal interpretation, Snow's comments were mere exhortations. Snow simply stated that he knew what happened and pressed Ruffin to tell the truth. No direct or implied promises of leniency were made. *See* ***Layne v. State***, 542 So. 2d 237, 240 (Miss. 1989) (citing ***Moore v. State***, 493 So. 2d 1301, 1303 (Miss. 1986)) (indicating that urging a defendant to "go ahead and tell the truth" is not an implied promise of leniency).

¶22.   Notably, there are surrounding circumstances which weigh in Ruffin's favor. He was only twenty-two years old, he offered testimony of his good reputation, and he had no prior experience with the criminal justice system. Such circumstances, however, are given little weight where there is no basis for coercion or inducement. We have stated that distinguishing between a mere exhortation and an inducement *generally depends* upon the surrounding circumstances. ***Willie***, 585 So. 2d at 668 (citing ***Miller***, 243 So. 2d at 559) (emphasis added). Here, a plain reading of Snow's comments reveals no coercion or inducement. Accordingly, we find the aforementioned circumstances insufficient to render his statement the product of coercion.[7]

---

[7] The lack of any intimidation, coercion, or deception is further supported by the testimony of Dr. W. Criss Lott who, after listening to the tapes, described the interrogation as "very civil, very appropriate and professional."

¶23. As to the allegation that coercive statements were made which were not recorded, Ruffin offered no evidence as to what Snow or any other officer said off the record. There is only some indication that Snow might have told Ruffin that he knew what really happened. Thus, we find this argument to be without merit.

¶24. Ruffin further submits that he was unable knowingly and intelligently to waive his rights due to his mental impairment. The record reveals that Ruffin suffers some mental impairment, including dyslexia. Pursuant to Ruffin's motion for a psychiatric examination, the trial court appointed Dr. W. Criss Lott, a clinical psychologist at St. Dominic Hospital in Jackson, Mississippi, to perform a mental examination of Ruffin. Lott estimated that Ruffin had a verbal IQ of 73, and a non-verbal IQ of 90, for a total score of 79. He assessed Ruffin's word recognition and reading ability to be at a fourth-grade level. Nevertheless, during his examination of Ruffin, Lott administered a test in which he gave Ruffin an explanation of his rights, and told Ruffin to read it out loud. He later had Ruffin restate those rights. Lott stated that Ruffin had no difficulty reading the rights, and appeared to understand and recall everything very well. Likewise, when Snow asked Ruffin whether he understood his rights, Ruffin responded affirmatively. Snow stated that Ruffin appeared to understand his rights. Accordingly, we find sufficient evidence to support that Ruffin appreciated the nature of his rights and the consequences of his decision to abandon those rights.

¶25. For the aforementioned reasons, we find that the trial court did not err in denying Ruffin's motion to suppress.

**II.    Whether the trial court abused its discretion in denying Ruffin's motion for a change of venue.**

¶26.   This Court reviews a trial court's decision to grant or deny a change of venue for abuse of discretion. *King v. State*, 960 So. 2d 413, 429 (Miss. 2007) (citing *Howell v. State*, 860 So. 2d 704, 718 (Miss. 2004)).

¶27.   A change of venue may be granted only if the defendant makes a satisfactory showing that he cannot receive a fair and impartial trial where the offense is charged. *King*, 960 So. 2d at 429 (citing *Byrom v. State*, 927 So. 2d 709, 715 (Miss. 2006)).  "'[U]pon proper application, there arises a presumption that [an impartial trial cannot be had]; and, the State then bears the burden of rebutting that presumption.'" *White v. State*, 495 So. 2d 1346, 1348 (Miss. 1986) (quoting *Johnson v. State*, 476 So. 2d 1195 (Miss. 1985)).   "Proper application" is met by complying with the change-of-venue statute found at Section 99-15-35 of the Mississippi Code Annotated (Rev. 2007).  *White*, 495 So. 2d at 1348-49.  Under Section 99-15-35, a change of venue must be requested "in writing, sworn to by the prisoner, made to the court, . . . supported by the affidavits of two or more credible persons, that, by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged . . . ."  Miss. Code Ann. § 99-15-35 (Rev. 2007).  An application for change of venue must strictly comply with this statute. *Baldwin v. State*, 732 So. 2d 236, 241 (Miss. 1999) (citing *Purvis v. State*, 71 Miss. 706, 14 So. 268 (1894)) (statutory deficiency where motion included two affidavits, but was not sworn to by the petitioner).

¶28.     Ruffin failed to comply with the statutory requirements set forth in Section 99-15-35.

Notwithstanding this failure, we find that the trial court did not abuse its discretion in

denying Ruffin's motion for a change of venue.  Ruffin argues that seventy-three jurors "is

too few potential jurors considering the higher standard of review for a capital murder trial,"

and the fact that one-third of these were disqualified for various reasons is proof that he could

not get a fair trial.[8]  Ruffin cites no authority to support his argument that too few jurors were

summoned, and we find no such authority ourselves.  *Cf. **Lutes v. State***, 517 So. 2d 541, 546

(Miss. 1987) (capital-murder case in which there were seventy-nine persons in the venire).

Furthermore, the fact that twelve jurors had heard something about the case and that fourteen

knew the victim's family is insufficient to warrant a change of venue.  *See **Shook v. State***,

552 So. 2d 841, 849 (Miss. 1989) (fifty-four out of the one-hundred-six persons in the venire

had either discussed the case, read about it in the newspaper or had other knowledge

concerning the case); ***Lutes v. State***, 517 So. 2d 541, 545-47 (Miss. 1987) (right to a fair trial

not compromised where seventy-one of seventy-nine veniremen had heard about the case).

**III.     Whether the trial court abused its discretion in denying Ruffin's motion for continuance.**

¶29.     "The decision to grant or deny a motion for a continuance is within the sound

discretion of the trial court and will not be reversed unless the decision results in manifest

---

[8] Of the seventy-three potential jurors, fourteen were excused for legal exemptions. Out of the remaining fifty-nine, thirteen said that they could not be fair and impartial for various reasons.  The trial judge found that thirteen out of fifty-nine was not enough to say that Ruffin could not receive a fair trial.

14

injustice." **Boone v. State**, 973 So. 2d 237, 241 (Miss. 2008) (quoting **Ross v. State**, 954 So. 2d 968, 1007 (Miss. 2007)).

¶30. At a pre-trial hearing on April 2, 2007, Ruffin's counsel, Chokwe Lumumba, made an ore tenus motion for a continuance. Lumumba had requested a continuance a few days earlier, and the trial court had indicated that it would grant a continuance only until April 11. Lumumba, however, could not agree to the April 11 continuance because of conflicts. In renewing his motion, Lumumba maintained that a continuance was necessary due to the complexity of the case and the gravity of the charge. He claimed that he had been unable to adequately prepare for trial due to his earlier suspension from the practice of law.[9] He also argued that there were witnesses who still needed to be interviewed, including Strahan. He contended that he had been notified only one week earlier of the State's intent to call Strahan as a witness. Finally, he alluded to the need for "psychological testimony" at the suppression hearing.

¶31. The trial court denied a continuance. The trial judge reasoned that Ruffin had had the legal services of co-counsel Imhotep Alkebu-lan as early as August 2005. The trial court also afforded Ruffin the opportunity to speak with Strahan before trial. As to the concern regarding "psychological testimony," the trial court pointed to the report by Lott in the record that could be used at the suppression hearing.

---

[9] In March 2005, Lumumba was suspended from the practice of law for a period of six months. **Miss. Bar v. Lumumba**, 912 So. 2d 871 (Miss. 2005). He was reinstated in an order dated January 18, 2007. **In Re: The Petition of Chokwe Lumumba for Reinstatement in the Mississippi Bar**, 962 So. 2d 536 (Miss. 2007).

15

¶32. We find that the trial court did not abuse its discretion in denying Ruffin's motion for a continuance. The record shows that, early on, Ruffin had the services of co-counsel. On March 18, 2005, Lumumba and Ali Shamsiddeen filed multiple motions on Ruffin's behalf. Both refered to themselves as "Attorney for the Defendant." On March 18, 2005, Ruffin filed a motion for appointment of additional counsel, requesting that Imhotep Alkebu-lan be appointed to serve as co-counsel.[10] Alkebu-lan subsequently made an entry of appearance on August 21, 2006, and is now Ruffin's attorney on appeal. But even if Lumumba had been Ruffin's sole legal counsel from the very beginning, he had adequate time to prepare for trial. Lumumba was reinstated to the practice of law on January 18, 2007, and Ruffin's trial did not start until April 2, 2007. *In Re: The Petition of Chokwe Lumumba for Reinstatement in the Mississippi Bar*, 962 So. 2d 536 (Miss. 2007). Thus, Lumumba had almost three months to prepare. This Court has found no error in similar cases where defense counsel had even less time to prepare. *Cole v. State*, 405 So. 2d 910, 911-12 (Miss. 1981) (seven days to prepare for a murder trial); *Garner v. State*, 202 Miss. 21, 24, 30 So. 2d 413, 414 (1947) (seven days to prepare for a capital murder trial). Additionally, Ruffin was afforded the opportunity to interview Strahan before trial, and had undergone a psychological examination by Lott on January 13, 2007. Lott's report was available for use at the suppression hearing.

**IV.    Whether Ruffin was entitled to a jury instruction that duress is a defense to the underlying felony of kidnapping on the capital-murder charge.**

---

[10] The State was apparently unclear as to who represented Ruffin. On August 18, 2006, the State filed a motion to determine, in part, who represented Ruffin.

¶33.   In reviewing the grant or denial of jury instructions, this Court considers the instructions as a whole and within context. *Strickland v. State*, 980 So. 2d 908, 922 (Miss. 2008) (quoting *Chandler v. State*, 946 So. 2d 355, 360 (Miss. 2006)).  While a defendant is entitled to have jury instructions that present his theory of the case, "the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Strickland*, 980 So. 2d at 922 (quoting *Chandler*, 946 So. 2d at 360) (emphasis removed); *see also* *Hester v. State*, 602 So. 2d 869, 872 (Miss. 1992) (even if the evidence is meager and highly unlikely, a defendant is entitled to present his defense and have the jury instructed accordingly).

¶34.   Capital murder is defined, in pertinent part, as murder which is "done with or without any design to effect death, by any person engaged in the commission of the crime of . . . kidnapping[11] . . . ."  Miss Code Ann. § 97-3-19(2)(e) (Rev. 2006).  Under Section 97-3-19(2)(e), the prosecution is not required to prove the elements of murder, but "only that a killing took place while the accused was 'engaged in the commission' of [one of] the

---

[11]  The applicable law at the time defined kidnapping as follows:

> Any person who shall without lawful authority forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be secretly confined or imprisoned against his or her will, or shall without lawful authority forcibly seize, inveigle or kidnap any child under the age of ten (10) years and secretly confine such child against the will of the parents or guardian or person having the lawful custody of such child, shall, upon conviction, be imprisoned for life in the state penitentiary if the punishment is so fixed by the jury in its verdict. . . .

Miss. Code Ann. § 97-3-53 (Rev. 2000), *amended by* 2004 Miss. Laws ch. 365, § 1.

enumerated felonies." ***Layne v. State***, 542 So. 2d 237, 243 (Miss. 1989).[12]  Should the State

fail to prove the underlying felony beyond a reasonable doubt, the accused could not be

guilty of capital murder as defined by Section 97-3-19(2)(e).  *See* Miss Code Ann. § 97-3-

19(2)(e) (Rev. 2006); ***Layne***, 542 So. 2d at 243.

¶35.    Over Ruffin's objection, the trial judge gave jury instruction S-7, which stated that

duress did not constitute a defense to capital murder.  Later, however, the trial judge allowed

the following jury instruction D-20A:

> Evidence has been presented that the defendant acted under duress in committing the crime.
>
> "Duress" is the exercise of unlawful force or threat of force upon a person whereby that person is compelled to do some act that he/she otherwise would not have done.  In order for duress to be a defense to a criminal charge, the impelling danger must be present, imminent, and impending and of such a nature as to induce in that person a well-grounded apprehension of death or serious bodily harm if the act is not done.  A person having a reasonable

---

[12]  Some language in a recent decision by this Court could be interpreted to require proof of both the underlying felony and the murder, as if either had been charged alone. ***Spicer v. State***, 921 So. 2d 292, 311 (Miss. 2006) (citing ***Fisher v. State***, 481 So. 2d 203, 212 (Miss. 1985)).  This language is accurate, but only with regard to death-penalty cases like ***Spicer*** and ***Fisher***.  In ***Enmund v. Florida***, 458 U.S. 782, 797, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), the United States Supreme Court held that the Eighth Amendment to the United States Constitution forbids imposing the death penalty on a person who aids and abets a felony in the course of which a murder occurs at the hands of another, but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force be employed.  Thus, when the death penalty is sought for capital murder as defined under Section 97-3-19(2)(e) (Rev. 2006), criminal intent of the type described in ***Enmund*** must be shown.  *See **Enmund***, 458 U.S. at 797-801.  Otherwise, Section 97-3-19(2)(e) does not require evidence sufficient to support murder. Miss Code Ann. § 97-3-19(2)(e) (Rev. 2006). The killing need not be done with a "deliberate design," or "in the commission of an act eminently dangerous to others and evincing a depraved heart."  Miss. Code Ann. § 97-3-19(1)(a)(b) (Rev. 2006).  The only relevant question is whether a killing, without the authority of law, occurred during the commission of one of the enumerated felonies.  ***Layne***, 542 So. 2d at 243; ***Moore v. State***, 344 So. 2d 731, 735 (Miss. 1977).

opportunity to avoid committing the crime without undue exposure to death or serious bodily harm cannot invoke duress as a defense.

If the State has failed to prove from the evidence in this case beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis that the defendant acted voluntarily in committing the crime and not under duress, then you shall find the defendant not guilty.

The trial judge allowed instruction D-20A on the basis that there was sufficient evidence to support a duress defense on the armed-robbery charge,[13] and that jury instruction S-7 made clear that duress is not a defense to capital murder.

¶36. Ruffin insisted that duress is a defense to the underlying felony of kidnapping. He requested that jury instruction S-7 be struck, and that an additional or amended instruction be given to indicate that duress is a defense to the underlying felony of kidnapping. The trial court denied his requests.[14]

¶37. Ruffin argues that the trial court erred by not allowing a duress instruction on the underlying felony of kidnapping. He submits that there is evidence to show that he acted at Strahan's behest, out of fear of being killed by Strahan. The State, on the other hand, contends that there is no evidentiary support for a duress instruction, and that if this Court concludes otherwise, duress simply cannot be a defense to capital murder. Furthermore, even if the trial court erred in refusing Ruffin's duress instruction, the State asserts it was harmless error.

---

[13] The trial judge found sufficient evidence of duress on the armed-robbery charge because there were no eyewitnesses to refute Ruffin's claim of duress.

[14] Although not raised as an issue on appeal, the trial court also denied Ruffin an instruction(s) on the lesser-included offenses of murder, manslaughter, and aggravated assault.

¶38. We find no foundation in the evidence to support Ruffin's theory that he participated in the kidnapping out of duress.

¶39. While not articulating the precise elements of a duress defense, this Court has adopted the general rule that "where a person reasonably believes that he is in danger of physical harm he may be excused for some conduct which ordinarily would be criminal." *West v. State*, 725 So. 2d 872, 891 (Miss. 1998) (citing *Knight v. State*, 601 So. 2d 403, 405 (Miss. 1992)). This Court has approvingly cited the following components of duress set forth by the Fifth Circuit Court of Appeals:

> (1) the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that he had not recklessly or negligently placed himself in the situation; (3) that he had no reasonable legal alternative to violating the law; (4) that a direct causal relationship may be reasonably anticipated between the criminal action and the avoidance of harm.

*West*, 725 So. 2d at 890 n.7 (citing *United States v. Harper*, 802 F.2d 115, 117 (5th Cir. 1986)). Furthermore, duress constitutes a defense to the crime of kidnapping. *See Milano v. State*, 790 So. 2d 179, 191-92 (Miss. 2001); *Brooks v. State*, 236 So. 2d 751, 754 (Miss. 1970); *Watson v. State*, 212 Miss. 788, 792-93, 55 So. 2d 441, 443 (1951) (quoting 15 Am. Jur. *Criminal Law* § 318 (1941)) (the law will excuse a person acting under duress for committing most, if not all crimes, with the exception of homicide).

¶40. Ruffin failed to show any "present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury." *West*, 725 So. 2d at 890 n.7 (citing *Harper*, 802 F.2d at 117); *see also Walker v. State*, 913 So. 2d 198, 235 (Miss. 2005) (no threat of any imminent danger which would cause a "well-grounded

apprehension of death or serious bodily harm"); ***Powe v. State***, 176 Miss. 455, 461, 169 So. 763, 765 (1936) (danger must be "present, imminent and impending"); ***Bain v. State***, 67 Miss. 557, 560 (1890) ("The impelling danger, however, should be present, imminent and impending, and not to be avoided."). When asked why he did not try to stop Strahan, Ruffin responded, "I WAS SCARED. . . . SCARED OF [STRAHAN]."[15] Ruffin never indicated that Strahan had threatened him or had done anything in particular to cause a well-founded fear of death or serious bodily injury. Moreover, on at least two occasions—once at the home and once at the cornfield—Ruffin actually possessed the gun.

¶41.    Ruffin also had reasonable alternatives to violating the law. *See **United States v. Bailey***, 444 U.S. 394, 410, 100 S. Ct. 624, 634, 62 L. Ed. 2d 575 (1980) (citing W. LaFave & A. Scott, Handbook on Criminal Law § 379 (1972)) ("[I]f there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the [duress] defense[] will fail."). At the very least, Ruffin could have attempted to renounce any further participation in the crime, and joined the other occupants at the back of the home. Alternatively, he could have tried to flee in the vehicle.

¶42.    Ruffin's case for duress is even weaker than what this Court deemed insufficient in *West*. In *West*, the defendant was actually threatened at gunpoint and told that he would be killed if he did not rob a convenient store and kill all the witnesses. *West*, 725 So. 2d at 888-

---

[15] Tommy White, Jr., and Jefferson testified that they too were scared of Strahan. While this may support the reasonableness of Ruffin's fear, it does nothing to refute that Ruffin had reasonable opportunities to avoid committing the crime, as discussed *infra*. *See West*, 725 So. 2d at 890.

89. Yet, similar to this case, the defendant in *West* possessed the gun immediately after these threats were made, and throughout the commission of the crime. *Id*.

¶43. We find that no rational juror could have concluded that Ruffin's participation in the kidnapping was under a threat of imminent danger, especially considering that he actually possessed the gun on at least two occasions and had reasonable alternatives to participating in the crime. *See West*, 725 So. 2d at 887-90. Because of a lack of evidentiary support, we find that Ruffin was not entitled to a duress instruction on the underlying felony of kidnapping.[16]

## V.      Whether cummulative error requires reversal.

¶44. Ruffin argues that the cummulative errors in the case, most significantly the denial of a duress instruction on the underlying felony of kidnapping, require reversal.

¶45. In *Byrom*, this Court clarified that in cases where harmless error or no reversible error is found, this Court will review on a case-by-case basis "whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect." *Byrom*, 863 So. 2d at 846-47. Having found no errors in the case before us, we find this issue to be without merit. *See Harris v. State*, 970 So. 2d 151, 157 (Miss. 2007).

## CONCLUSION

---

[16] Ruffin also suggests that his mental incompetency made him more susceptible to Strahan's intimidation. We find this argument to be without merit. Duress is considered from an objective, reasonable-person standard. *See West*, 725 So. 2d at 891 n.8 (where no rational juror could find objective duress, the defendant was not entitled to any "subjective fear instruction"); *see also United States v. Willis*, 38 F.3d 170, 175-76 (5th Cir. 1994).

¶46.   We find that the trial court did not err in denying Ruffin's motion to suppress because there was sufficient evidence to support that he was adequately advised of his rights and that he validly waived those rights.  We also find that the trial court did not abuse its discretion in denying Ruffin's motion for a continuance and motion for a change of venue.  Finally, because there is no foundation in the evidence to support a duress defense to the underlying felony of kidnapping, we find that the trial court did not err in denying a duress instruction on kidnapping.  Therefore, we affirm Ruffin's convictions and sentences.

¶47.   **COUNT I:  CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PAROLE, AFFIRMED. COUNT II: CONVICTION OF ARMED ROBBERY AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.  THE SENTENCE IMPOSED IN COUNT II SHALL RUN CONCURRENT TO THE SENTENCE IMPOSED IN COUNT I.**

**SMITH, C.J., DIAZ, P.J., EASLEY, CARLSON, GRAVES, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.**